


WILLIAM HANHARDT,          )
                           )
        Movant,          )      07 C 2542
                           )
      v.                )
                           )      Hon. Charles R. Norgle
UNITED STATES OF AMERICA,  )
                           )
        Respondent.    )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is movant William Hanhardt's Motion to Vacate, Set Aside, or Correct

Sentence filed pursuant to 28 U.S.C. § 2255. For the following reasons, the Motion is denied.

## I. BACKGROUND

### A. Facts

Movant William A. Hanhardt ("Hanhardt") had a career spanning approximately thirty

years with the Chicago Police Department ("CPD"), and he held several high-ranking positions

in the CPD, including Commanding Officer of the Criminal Intelligence Unit, 14th District

Police Commander, and Chief of Detectives. Hanhardt, however, betrayed his office, the City of

Chicago, and the CPD in a most egregious manner. Beginning in the early 1980s, and continuing

until 1998, Hanhardt acted as the leader of a sophisticated criminal enterprise which was

associated with organized crime, and involved in jewelry theft. This enterprise consisted of

Hanhardt, Joseph N. Basinski, ("Basinski"), Guy Altobello ("Altobello"), Paul J. Schiro

("Schiro"), Sam DeStefano ("DeStefano"), William Brown ("Brown"), and others.

The Court will outline the nature of this conspiracy below, but in its simplest terms, these individuals were involved in the targeting and surveillance of traveling jewelry salespersons for the purposes of stealing their inventory. Over the course of the conspiracy, Hanhardt and the other members of the criminal enterprise identified and targeted more than 100 jewelry salespersons, and committed at least nine jewelry thefts, netting the conspirators in excess of $5 million. These thefts occurred in at least seven states, including Arizona, California, Michigan, Minnesota, Ohio, Texas, and Wisconsin.

Hanhardt was the director of this conspiracy. In that capacity, he supervised Basinski and the other members of the conspiracy. Together, Hanhardt and Basinski commanded the activities of numerous individuals associated with the enterprise. In so doing, Hanhardt used the telephone at his residence in Deerfield, Illinois, to gather information and direct the conspirators. Under Hanhardt's leadership, participants in this conspiracy, including Basinski and Altobello, gathered information on numerous potential jewelry theft victims through physical surveillance. Among those surveilled were: a Nafco Gems, Ltd. representative, his residence, car, and place of business in Arizona on various occasions in 1995 and 1996; a jewelry appraiser, his car and residence in Arizona in 1996; a Mayfield Company representative, her car, residence, and place of business in Arizona in 1996; a Baume & Mercier salesperson, his car and residence in Illinois in 1996; and a Kobi Katz, Inc./Lieber & Solow, Ltd. salesperson's residence in Illinois in 1996. Members of the conspiracy also physically surveilled jewelry stores in Phoenix, Scottsdale, and Glendale, Arizona.

In addition to the physical surveillance of jewelry salespeople and jewelry stores, Hanhardt and Basinski attended numerous jewelry trade shows designed for jewelry wholesalers

2

and retailers in order to identify individuals involved in the jewelry trade, and to evaluate the quality and quantity of merchandise offered by these wholesalers and retailers. Hanhardt and Basinski attended jewelry trade shows in Tucson, Arizona and Las Vegas, Nevada.

Physical surveillance, however, was not the only means by which Hanhardt and the other conspiracy members were able to obtain information regarding potential theft victims. Remarkably, Hanhardt requested that CPD officers undertake database searches of CPD and other law enforcement computers to obtain information regarding jewelry salespersons. Among these database searches were: a search for the Arizona license plate of a Nafco Gems, Ltd. representative's car, utilizing the National Law Enforcement Telecommunications System ("NLETS") on January 20, 1996; a search for the Arizona license plate of a jewelry appraiser's car, utilizing NLETS, on February 7, 1996; and four separate searches for Illinois license plates of various jewelry company salespersons or representatives in 1996.

Hanhardt also used a private investigator in the District of Columbia to conduct credit bureau database searches, along with other commercial database searches, to obtain personal and financial information regarding traveling jewelry salespersons. These database inquiries included numerous searches through credit reporting companies such as Database Technologies, Inc., Equifax Credit Information Services, Inc., and Trans Union Corporation. These searches occurred at various times during the years 1992-1996.

Hanhardt and the other members of the conspiracy also participated in the theft of jewelry. In all, the conspirators stole at least $5 million worth of jewelry. These thefts included the following: a theft from the vehicle of a Baume & Mericer, Inc. salesperson of approximately 180 watches worth $310,000 in Glendale, Wisconsin, on October 8, 1984; a theft from the

3

vehicle of a Rolex Watch, USA, Inc. salesperson of watches having a value of approximately $500,000 in Monterrey, California, in October 1986; a theft of jewelry worth approximately $125,000 from a Gordon Brothers Corporation salesperson in Englewood, Ohio, in August 1989; a theft from a Gem Platinum salesperson of jewelry worth approximately $1,300,000, in Dallas, Texas, in June 1992; a theft from another Gen Platinum salesperson of jewelry worth approximately $1,000,000 in Flat Rock, Michigan, in June 1993; a theft from a H.K. Mallak, Inc. salesperson of jewelry worth approximately $240,000 in Mankato, Minnesota, on August 3, 1993; a theft from jewelry company representatives of jewels worth approximately $170,000 in Phoenix, Arizona, on May 7, 1994; and a theft from safety deposit boxes at a Columbus, Ohio hotel of jewelry and United States currency worth approximately $1,500,000, on August 27, 1994. Another victim of this conspiracy was subjected to an armed robbery in which he was threatened with a gun, struck on the head with that gun, and bound hand and foot. The conspirators also attempted at least two other robberies.

The government's investigation of this conspiracy lasted approximately four and a half years, and spanned several states. During this investigation, the District Court of the Northern District of Illinois authorized numerous wiretaps, in accordance with Title III of the Omnibus Crime and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., and several pen registration/caller identification devices. Many of these wiretaps were authorized by Chief Judge Aspen; however, this Court authorized between 20% and 30% of all the orders authorizing wiretaps and caller identification devices. These wiretaps resulted in the interception of numerous conversations on Basinski's Arizona home and cellular telephone, and on Hanhardt's home telephone in Deerfield, Illinois.

4

The FBI also observed the conspirators conducting physical surveillance of jewelers in Arizona, Illinois, Wisconsin, Nevada, and Indiana. The government obtained photographs and videotapes of the conspirators engaged in criminal activities, and through the use of cooperating individuals, recovered some of the stolen jewelry. In addition, the government obtained telephone records which showed contact between the conspirators. Acting pursuant to a search warrant, the government obtained hundreds of documents maintained by the conspirators. These documents contained personal and financial information on jewelry salespersons, including credit reports, car rental agreements, bank account information, non-published home telephone numbers, home addresses, and travel itineraries. Again operating pursuant to a search warrant, the government seized twenty-eight briefcases, boxes, and containers holding the sophisticated tools used by the conspirators during these thefts, including electronic eavesdropping equipment, locksmith tools, hotel keys, key blanks, key cutting dies, and keymaking machines. Finally, the government recovered three loaded weapons: a Browning 7mm pistol, a Colt .38 revolver, and a North American Arms .22 revolver.

## B. Procedural History

### 1. The Criminal Case

On October 19, 2000, the Special Grand Jury returned an indictment against Hanhardt and five Co-Defendants. Count 1 of the indictment charged Hanhardt, Basinski, DeStefano, Schiro, and Altobello with one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count 2 of the indictment charged Hanhardt, Basinski, Schiro, and Brown with conspiracy to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371. The Defendants filed numerous pretrial motions, in response to which the Court wrote and

5

published several Opinions. For an overview of these motions and the Court's Opinions, see United States v. Hanhardt, 424 F. Supp. 2d 1065 (N.D. Ill. 2006).

All five Defendants ultimately pled guilty to the indictment. DeStefano pled pursuant to a written plea agreement on August 24, 2001. Basinski pled pursuant to a written plea agreement on August 31, 2001. Altobello submitted a blind plea on September 26, 2001. Schiro pled pursuant to a written plea agreement on October 11, 2001. Hanhardt submitted a blind plea on October 25, 2001. Brown pled pursuant to a written plea agreement on May 7, 2002.

The Court initially sentenced Defendants to the following terms of imprisonment: Hanhardt, 188 months; Basinski, 108 months; Schiro, 65 months; DeStefano, 60 months; Altobello, 65 months; and Brown, 25 months. Hanhardt's sentence included $5,145,000 in restitution. At Hanhardt's sentencing hearing, the Court found that Hanhardt was a leader of the criminal enterprise, and that he was responsible for an armed robbery of a jewelry salesperson. The Court also imposed a two-level enhancement to Hanhardt's offense level, pursuant to the Sentencing Guidelines § 3C1.1, upon determining that Hanhardt had obstructed justice by intentionally overdosing on controlled substances. This intentional overdose caused Hanhardt to be hospitalized and subsequently miss a court date. The Court also enhanced Hanhardt's offense by two levels after determining that Hanhardt had participated in a theft from a person of another, pursuant to Guidelines § 2B1.1. Finally, the Court denied Hanhardt's request for a downward departure for acceptance of responsibility. The Court determined that Hanhardt's blind plea, coming nine days after the trial was scheduled to begin, and Hanhardt's evasive answers as to whether he agreed with the Assistant United States Attorney's statements at the plea colloquy, did not indicate a legitimate acceptance of responsibility on Hanhardt's part.

On appeal, the Seventh Circuit affirmed Hanhardt's conviction and sentence, with the exception of the obstruction of justice enhancement. United States v. Hanhardt, 361 F.3d 382 (7th Cir. 2004). The Appellate Court first noted that the District Court had "based [this] enhancement on its finding that Hanhardt had acted willfully, and with the specific intent not to be present in court . . ., and that he had the intent to impede the prosecution of this case." Id. at 388. However, the Appellate Court determined that this finding was erroneous, characterizing Hanhardt's intentional overdose as an attempted suicide. "We do not believe that an attempted suicide can be considered an obstruction of justice . . . The nature of suicide does not lend itself to a clear understanding of an individual's motivation other than the obvious intent to end his life." Id. at 388-89. The Seventh Circuit therefore vacated Hanhardt's level enhancement for obstruction of justice, and remanded the case for re-sentencing. Id. at 395. On remand, the Court re-sentenced Hanhardt to 141 months imprisonment, within the new appropriate Guidelines range.

Hanhardt then appealed the Seventh Circuit's decision to the United States Supreme Court. The Supreme Court granted certiorari, vacated the judgment, and remanded the case to the Seventh Circuit "for further consideration in light of United States v. Booker, 543 U.S. 220 (2005)." Altobello v. United States, 543 U.S. 1097 (2005). The Seventh Circuit then ordered this "limited remand pursuant to Paladino to give the district judge an opportunity to determine whether he would reimpose his original sentences." United States v. Hanhardt, No. 02-2253, slip op. at 3 (7th Cir. June 8, 2005). In an Opinion and Order dated March 13, 2006, the Court determined that it would reimpose Hanhardt's original sentence, in light of the fact that the Guidelines are now advisory rather than mandatory. Hanhardt, 424 F. Supp. 2d at 1065.

### 2. *Hanhardt's Motion under § 2255*

Hanhardt filed his Motion pursuant to § 2255 on May 7, 2007. This Motion contains an affidavit from Hanhardt indicating, inter alia, that he was experiencing serious psychological and emotional problems at the time of his plea colloquy. The Court ordered that the government file a response to Hanhardt's motion, and provide the Court with a transcript of Hanhardt's change of plea hearing. The government timely complied with the Court's order. On November 9, 2007, Hanhardt submitted his reply to the motion, along with affidavits from his wife and daughter that also referenced his alleged psychological issues. The Court granted the government leave to file a sur-reply to address the issues raised in the affidavits of Hanhardt's wife and daughter. The government timely filed its sur-reply, and Hanhardt's Motion under § 2255 is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

Section 2255 allows a person convicted of a federal crime to vacate, set aside, or correct his sentence. This relief is available only in limited circumstances, such as where an error is jurisdictional, of Constitutional magnitude, or there has been a "complete miscarriage of justice." See Harris v. United States, 366 F.3d 593, 594 (7th Cir. 2004). This statute states:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

28 U.S.C. § 2255 ¶ 1. If the court determines that any of these grounds exists, it "shall vacate

and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255 ¶ 2. In making that determination, the court must review the evidence and draw all reasonable inferences from it in a light most favorable to the government. See United States v. Galati, 230 F.3d 254, 258 (7th Cir. 2000); Carnine v. United States, 974 F.2d 924, 928 (7th Cir. 1992).

Section 2255 petitions are subject to various bars, including that of procedural default. Section 2255 petitions are "'neither a recapitulation of nor a substitute for a direct appeal.'" McCleese v. United States, 75 F. 3d 1174, 1177 (7th Cir. 1996) (citations omitted). Therefore, a § 2255 motion cannot raise: (1) issues that were raised on direct appeal, unless there is a showing of changed circumstances; (2) non-Constitutional issues that could have been raised on direct appeal, but were not; and (3) Constitutional issues that were not raised on direct appeal. See Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992) (overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7th Cir. 1994)).

There are two exceptions to the procedural default rule: (1) if the movant demonstrates cause for failing to raise the issue and actual prejudice resulting therefrom; or (2) the court's refusal to consider the Constitutional issue would result in a fundamental miscarriage of justice, which requires a showing of actual innocence. See Belford, 975 F.2d at 313 (collecting authority); see also McCleese, 75 F.3d at 1177-78 (discussing fundamental miscarriage of justice). In light of these principles, the court examines Hanhardt's motion.

**B. Hanhardt's Claims under § 2255**

Hanhardt advances two central assertions in support of his Motion pursuant to § 2255. First, he argues that the Court should vacate its factual finding that Hanhardt was involved in and

9

responsible for the armed robbery of jewelry salesman Esagh Kashimallak ("Kashimallak"). Second, he asserts that his attorneys at trial were constitutionally ineffective.

## 1. The Kashimallak Robbery

Hanhardt first asserts that the Court should modify his sentence by vacating its finding that Hanhardt was responsible for the August 23, 1995 Kashimallak robbery. This robbery occurred in a hotel room in Brookfield, Wisconsin. During the robbery, two individuals struck Kashimallak in the head, displayed a gun, tied his ankles and wrists with tape, and took his jewelry case. If the Court were to vacate its finding that he was responsible for this robbery, Hanhardt explains, this would remove the element of violence from his prison record and allow the Bureau of Prisons to transfer him from his current confinement at a minimum security Federal Corrections Institute to a Prison Camp in Oxford, Wisconsin.[1]

Hanhardt advances three arguments in support of this claim. First, he asserts that he was not actually involved in this robbery. Second, he asserts that the Court's finding has unfairly caused him to be placed in a minimum security prison rather than a prison camp. Finally, he argues that the Court should vacate this finding because of his old age, ill health, and because of his many years of service in the Chicago Police Department.

During his sentencing hearing, the Court heard testimony from Kashimallak and FBI Special Agent Edward McNamara regarding the robbery, and determined that these witnesses were credible. Hanhardt, 361 F.3d at 387. The Court then made a factual finding based on a preponderance of the evidence that Hanhardt was responsible for this robbery. Id. The Seventh Circuit affirmed the court's finding. Id. The Court carefully considered the testimony of the

---

[1] Hanhardt is presently assigned to FCI Englewood in Littleton, Colorado.

witnesses on this issue and did not lightly make its finding, and it will not and cannot revisit the matter at this time. See Belford, 975 F.2d at 313 (a § 2255 motion cannot raise issues that were previously raised and determined on direct appeal from a criminal conviction); McCleese, 75 F.3d at 1177 (motions under § 2255 are "neither a recapitulation of nor a substitute for a direct appeal.").

Issues regarding Hanhardt's health and his placement within the Bureau of Prisons, moreover, are not relevant to the factual finding at issue, and the facts adduced at trial indicated that Hanhardt's career with the Chicago Police Department was, to be charitable, checkered. These considerations cannot serve as a basis for the Court to rewrite history and reverse its determination that Hanhardt was involved in the Kashimallak robbery. Hanhardt's first claim under § 2255 therefore fails.

### 2. Ineffective Assistance of Counsel

Hanhardt asserts that his attorneys at trial, William A. Von Hoene ("Von Hoene") and Thomas P. Sullivan ("Sullivan"), were constitutionally ineffective. Hanhardt argues that these attorneys failed to investigate Hanhardt's competency to enter a plea of guilty, failed to secure medical records concerning Hanhardt's suicide attempt and hospitalization immediately preceding his plea of guilty, ignored the pleas of various members of Hanhardt's family regarding his emotional and psychological state, and coerced him into pleading guilty when he was in a vulnerable psychological state. In a related claim, Hanhardt asserts that when he pled guilty, he was unaware of what he was doing. As the Court will explain below, however, all of these claims are belied by Hanhardt's own statements made in open court, under oath, at his plea colloquy.

11

### a. the *Strickland* standard

In order to establish that his attorneys were ineffective, Hanhardt must "show that [his] counsel[s'] performance was deficient, and that the deficiency prejudiced [his] defense." See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Benefiel v. Davis, 357 F.3d 655, 662 (7th Cir. 2004) (quoting Strickland, 466 U.S. at 694). An ineffective assistance of counsel claim may be brought in a § 2255 motion, regardless of whether the claim was raised on appeal. Massaro v. United States, 538 U.S. 500, 504 (2003).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002) (quoting Strickland, 466 U.S. at 689). There is therefore a strong presumption that Hanhardt's attorneys performed reasonably. See Strickland, 466 U.S. at 690; see also Cooper v. United States, 378 F.3d 638, 641 (7th Cir. 2004). To succeed in his claim, Hanhardt must show "errors so serious that counsel was not functioning as 'counsel' guaranteed [to him] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

## b. Hanhardt's plea hearing

On October 25, 2001, Hanhardt, accompanied by attorneys Van Hoene and Sullivan, pled

guilty in open court. Assistant United States Attorneys John Scully ("Scully"), John Podliska

("Podliska"), and Eric Sussman ("Sussman") appeared on behalf of the government. The

following are pertinent excerpts from the transcript of the proceedings.

THE CLERK: 00 CR 853, United States versus William Hanhardt.
MR. SCULLY: John Scully, John Podliska and Eric Sussman on behalf of the United States, your honor.
THE COURT: Good morning, counsel.
MR. PODLISKA: Good morning.
MR. SUSSMAN: Good morning, judge.
MR. SULLIVAN: Thomas Sullivan and William Von Hoene for Mr. Hanhardt.
MR. VON HOENE: Good morning, your honor.
THE COURT: Good morning.
MR. SULLIVAN: Mr. Hanhardt is here present in court.
THE COURT: Mr. Hanhardt, please raise your right hand and be sworn.
THE DEFENDANT: I beg your pardon?
THE COURT: Please raise your right hand [and] be sworn.
(Defendant sworn.)
THE COURT: Mr. Scully, how does the matter come before the court?
MR. SCULLY: Your honor, it's our understanding that Mr. Hanhardt is going to plead today.
THE COURT: You mean change his plea?
MR. SCULLY: Yes, your honor.
THE COURT: Is that correct, Mr. Sullivan?
MR. SULLIVAN: Yes, your honor. Mr. Hanhardt is here this morning ready to withdraw his previously entered plea of not guilty, and enter a plea of guilty to the charges in the indictment.
THE COURT: Is that correct, Mr. Van Hoene?
MR. VAN HOENE: It is, your honor.
THE DEFENDANT: Yes.
THE COURT: Mr. Hanhardt, your attorney has advised the Court that you wish to withdraw your plea of not guilty and to enter a plea of guilty. Is that correct?
THE DEFENDANT: Yes, it is. Good morning.
THE COURT: I know that you are in custody, but I will ask you certain questions in any event. Within the last 24 hours have you used any alcoholic beverages?

13

THE DEFENDANT: No, sir, I have not.

THE COURT: Are you using any controlled substances, other than those prescribed by a physician?

THE DEFENDANT: No sir, I am not.

THE COURT: Now, have you, within the last 24 hours or so, taken any medication?

THE DEFENDANT: Yes, I have.

THE COURT: And do you know what it is?

THE DEFENDANT: I don't know the name, your Honor. I know the name of one: Hytrin. It's a prostate medication.

THE COURT: And when did you take it?

THE DEFENDANT: I'm taking an anti-depressant, and I'm also taking an anti-inflammatory.

THE COURT: I'm asking you these questions in order to determine whether you are clear-minded this morning, and to be sure that you know what you are doing, and that is the reason why I'm asking these specific questions. But are you clear-minded this morning?

THE DEFENDANT: I believe I am.

THE COURT: And when did you last take any medication?

THE DEFENDANT: Approximately 6:00 a.m.

THE COURT: And since then have you eaten breakfast?

THE DEFENDANT: Yes, I have.

THE COURT: If you recall, what did you have?

THE DEFENDANT: Two hard-boiled eggs, cold cereal, and that was it. Banana.

THE COURT: All right. Do you know what you are doing?

THE DEFENDANT: Yes, I do.

THE COURT: And have you talked to your attorneys, Mr. Von Hoene and Mr. Sullivan, this morning?

THE DEFENDANT: Yes, I have.

THE COURT: Were you able to understand what they were saying to you?

THE DEFENDANT: Yes, I d[id].

THE COURT: Do you believe that they were able to understand what you were saying to them?

THE DEFENDANT: I hope so.

THE COURT: Indeed. So how far have you gone in school?

THE DEFENDANT: 14 years.

THE COURT: And until – you are retired presently, is that correct?

THE DEFENDANT: Yes, I am.

THE COURT: And prior to your retirement, what did you do for a living?

THE DEFENDANT: Chicago police officer.

THE COURT: And for how many years was that?

THE DEFENDANT: 33 and a half.

14

THE COURT: And what year did you retire?
THE DEFENDANT: 1986.
THE COURT: If you withdraw your plea of not guilty in this case and enter a plea of guilty, you give up certain rights, and I will now tell you what those rights are.

Plea Hr'g, at 2-5.

At this point, the Court advised Hanhardt that by pleading guilty, he would be giving up his right to a trial by jury or by the Court in which the government would have the burden of proving his guilt beyond a reasonable doubt. The Court also explained that Hanhardt and his attorneys would have the right to participate in jury selection, that he would have the right to confront the witnesses against him, that he would have the right to testify or remain silent, and that he would have the right to present his own witnesses and evidence. The Court then asked Hanhardt whether he understood the things the Court had just said.

THE DEFENDANT: Yes, sir, I d[id].
THE COURT: Do you have any questions on anything that I have said?
THE DEFENDANT: No, sir.
THE COURT: And when you talked to – how many times have you discussed this case with Mr. Sullivan?
THE DEFENDANT: I believe I retained Mr. Sullivan on December 12th, 2000. And I would – probably, Mr. Sullivan and his staff, a minimum of once a week in person; telephonically, several times more than that.
THE COURT: And when you say "his staff," that includes Mr. Von Hoene?
THE DEFENDANT: Yes. And others at Jenner & Block.
THE COURT: Several other attorneys that have worked with Mr. Sullivan and Mr. Von Hoene –
THE DEFENDANT: Yes.
THE COURT: – in your representation.
THE DEFENDANT: Yes, sir.
THE COURT: Have you had enough time to think about all of these matters?
THE DEFENDANT: Yes, I have.
THE COURT: Now, when you discussed this case with your attorneys, Mr. Von Hoene, Mr. Sullivan and others, did they explain to you what your rights are and what you would be giving up by pleading guilty?
THE DEFENDANT: Yes, they did.

15

> THE COURT: And when they discussed your rights with you, did they say essentially the same things that I have just said, but using other words and language?
> THE DEFENDANT: Yes, they did.
> THE COURT: Now, you understand, I assume, that there is no written plea bargain between you, your lawyers and the government, is that correct?
> THE DEFENDANT: Yes, I do.
> THE COURT: There is no agreement.
> THE DEFENDANT: I understand that.

Id. at 8-9.

The Court then allowed Von Hoene to offer a proposed factual basis to support Hanhardt's plea of guilty. Von Hoene then indicated that Hanhardt acknowledged, inter alia, that he was a member of a conspiracy engaged in a multi-state scheme to steal jewelry from jewelry salespersons traveling in interstate commerce, that this conspiracy affected the movement of stolen jewelry across state lines, and that Hanhardt agreed to a preliminary order of forfeiture in the amount of $4,845,000 against him for property acquired in the course of these offenses. In offering these facts, Von Hoene outlined Hanhardt's participation in the surveillance of jewelry salespersons, his communications with other members of the conspiracy, and his participation in the theft of jewelry and the movement of this jewelry across state lines. The court then returned its attention to Hanhardt.

> THE COURT: Mr. Hanhardt, did you hear what your attorneys just said are the facts that support your plea of guilty to Count 1 and Count 2 as alleged in the indictment?
> THE DEFENDANT: Yes, sir, they are.
> THE COURT: Are these the facts upon which you are offering to plead guilty to Count 1 and Count 2 as alleged in the indictment?
> THE DEFENDANT: Yes, sir.
> THE COURT: To put it another way, is that what happened and is that what occurred in this case?
> THE DEFENDANT: Yes, it is.

Id. at 14.

At this point, the Court allowed the government to summarize what its evidence would show if the case were to go to trial.

> MR. SCULLY: As to Count 1 of the indictment, the evidence would show during the period charged in the indictment a criminal organization consisting of William Hanhardt, Joseph Basinski, Paul Schiro, Sam DeStefano, Guy Altobello, and others, including James D'Antonio and Robert Paul, both now deceased, engaged in one of the country's most successful and long-lasting organized crime nationwide schemes to identify, surveil, stalk, and steal jewelry from jewelry salespersons, the evidence showing significantly more than 100 jewelry salespersons traveling in interstate commerce with lines of wholesale jewelry valued in excess of $40 million being targeted. Over a period of more than 15 years, Defendant Hanhardt, Basinski, and other members of the organization, committed at least eight jewelry thefts, totaling in excess of $5 million in at least seven states, including Arizona, California, Michigan, Minnesota, Ohio, Texas and Wisconsin. This group of individuals constituted an enterprise, as that term is used in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which enterprise was engaged in and the activities of which affected interstate commerce.

Id. at 16-17.

Scully then indicated that the government's evidence included, inter alia, wiretap conversations between Hanhardt and the co-conspirators, still photographs and videotapes of Hanhardt's criminal activities, FBI agents' testimony regarding their physical surveillance of Hanhardt, stolen jewelry, telephone records, detailed records kept by the conspirators concerning the targeted jewelry salespeople, and 28 briefcases of the physical burglary tools used by the conspirators. Scully went on to explain that Hanhardt was far from a minor participant in this conspiracy

> MR. SCULLY: []William A. Hanhardt was the leader of the enterprise. His involvement dates to the beginning of the conspiracy. He supervised Joseph N. Basinski, and directed the activities of the others employed by and associated with the enterprise, including Paul Schiro, Sam DeStefano, Guy Altobello, James D'Antonio, Robert Paul, and others. Hanhardt directed the gathering of information on more than 100 potential jewelry theft victims and the surveillance of numerous such individuals. He utilized at least two active Chicago police department officers,

17

a detective and a sergeant, while they were on duty with the Chicago police department, to do database searches of CPD and other law enforcement computers to obtain detailed information concerning jewelry salespersons.

Id. at 19.

Scully's detailed summary of the government's evidence takes up approximately twenty-three pages of the plea hearing transcript. At the close of Scully's summary, the Court inquired as to whether Hanhardt heard and understood what the evidence would be, if this case were to go to trial.

THE COURT: Mr . Hanhardt –
THE DEFENDANT: Yes.
THE COURT: – you have heard what your attorneys have just said, is that correct?
THE DEFENDANT: Yes, I have, sir.
THE COURT: Both what Mr. Sullivan and Mr. Van Hoene said. And you have heard what the government says its evidence would show if this case proceeded to a trial, have you not?
THE DEFENDANT: In essence, yes.
THE COURT: You heard everything that Mr. Scully just said?
THE DEFENDANT: I don't agree with everything he said. It's my understanding that was to [be] taken up by my attorneys with the government.
THE COURT: You have offered to plead guilty to Count 1 and Count 2 as alleged in the superceding indictment, is that correct?
THE DEFENDANT: Yes, sir.
THE COURT: Are you pleading guilty to Count 1 as alleged in the superceding indictment?
THE DEFENDANT: In its entirety, no, sir.
THE COURT: Are you pleading guilty to Count 2 as alleged in the superceding indictment?
THE DEFENDANT: Yes, sir, I am.
THE COURT: Are you pleading guilty because you are guilty?
THE DEFENDANT: Yes, sir, I am.
THE COURT: And you have read and discussed this superceding indictment with your attorneys?
THE DEFENDANT: Yes, sir, I have.
THE COURT: And your plea of guilty is to the indictment, is that right?
THE DEFENDANT: Yes, sir.
THE COURT: So you are pleading guilty as alleged in the indictment – the

18

superceding indictment as to Count 1, is that right?

MR. SULLIVAN: Your Honor, may we have a moment?

THE COURT: Yes. Certainly.

(Pause.)

MR. SULLIVAN: Your Honor, if I may, Mr. Hanhardt is pleading guilty to the charge in Count 1. As he said, he doesn't agree with all the details that the government has stated, but he is pleading guilty to the charge in Count 1. And to the extent it's relevant on matters of sentencing, those matters will be dealt with at the appropriate time.

THE COURT: But it should be clear, if it is accurate to say, that the plea to Count 1 is as alleged in the superceding indictment, and also that the plea is guilty as to Count 2 in the superceding indictment. Is that what your client is doing?

MR. SULLIVAN: Yes, your Honor. But with the qualifications I just made before.

Id. at 40-42.

The Court then explained to Hanhardt that the maximum penalty he faced was twenty-five years imprisonment, a fine of up to $500,000, a term of supervised release, and restitution. The Court went on to inquire further into Hanhardt's understanding of the potential penalties he faced, as well as his understanding of other aspects of the proceedings.

THE COURT: Do you understand what the maximum penalties may be as to Count 1 and Count 2 of the superceding indictment?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And did your attorneys tell you what the maximum penalties are as to Count 1 and Count 2 when you talked to them about this case?

THE DEFENDANT: Yes, sir, they have.

THE COURT: And was their representation as to the maximum penalties consistent with what I have just said?

THE DEFENDANT: Just about the same.

THE COURT: And when you discussed with your attorneys this issue of your plea of guilty to Count 1 and Count 2, did they explain to you what your rights are and what you would be giving up by pleading guilty?

THE DEFENDANT: They explained the Guidelines quite extensively.

THE COURT: With respect to your rights to trial, and so forth, as I have previously explained to you, did they explain all of that to you?

THE DEFENDANT: Yes sir, they did.

THE COURT: And as to the rights that you would be giving up upon your plea of guilty, when you did talk to your lawyers, were their statements consistent with what

19

I have just said?

THE DEFENDANT: With one exception: my right to have an appeal to the Title III.

THE COURT: This is not a conditional plea –

THE DEFENDANT: I understand that, your Honor.

THE COURT: – of guilty.

THE DEFENDANT: But are you asking me –

THE COURT: Does the government understand this to be a conditional plea of guilty?

MR. PODLISKA: It is not.

THE COURT: Does the government agree to a conditional plea of guilty?

MR. PODLISKA: No.

THE COURT: Is this presented to the court as a conditional plea of guilty?

MR. SULLIVAN: Your Honor, we have advised Mr. Hanhardt that by entering this plea of guilty he is giving up his right of appeal from your Honor's denial of the pretrial motion to suppress.

THE COURT: Is that correct, Mr. Hanhardt?

THE DEFENDANT: It is at this moment, yes sir. It wasn't prior to coming in here.

THE COURT: Well, this might be an appropriate time to take a short coffee break.

THE DEFENDANT: I'd settle for water.

THE COURT: Or tea, as the case may be. We will take a short break and return to this matter.

(Recess.)

THE COURT: Mr. Von Hoene and Mr. Sullivan, have you had a sufficient opportunity to discuss these issues with your client?

MR. SULLIVAN: Yes, your honor.

THE COURT: Now, on this last point of whether the plea here is conditional or otherwise, what is the defendant's position?

MR. SULLIVAN: Mr. Hanhardt understands that by entering this plea of guilty he is forfeiting his right to seek appellate review of your denial of his motion to suppress.

THE COURT: Not only the motion to suppress, but any other pretrial ruling by the Court, is that correct?

MR. SULLIVAN: I stand corrected. All pretrial rulings by the Court.

THE COURT: Do you understand that, Mr. Hanhardt?

THE DEFENDANT: Yes, I do.

THE COURT: Now, encompassed within that is the ruling, of course, on the so-called Basinski briefcase, as well as the Title III issues, and any other pretrial –

MR. SULLIVAN: There was a motion to recuse.

THE COURT: Motion to recuse, et cetera. So this is – I don't want to put words in your mouth – but as I understand what you are suggesting here, it is a complete, full and absolute plea of guilty. Unconditional.

20

MR. SULLIVAN: That is correct.

THE COURT: And, Mr. Hanhardt, have you discussed this just now with Mr. Von Hoene and Mr. Sullivan?

THE DEFENDANT: I understand it completely and I agree.

THE COURT: So that it is absolutely clear, the Court is not accepting your plea here as a conditional plea. Do you understand that?

THE DEFENDANT: I understand. I understand.

THE COURT: Now, you have told the Court that you have discussed this case on numerous occasions with all of your attorneys, is that right?

THE DEFENDANT: Yes, sir, I have.

THE COURT: Once again, have you had enough time to think about all these matters?

THE DEFENDANT: Yes, sir, I have.

. . . . . . . .

THE COURT: All right. Now, Mr. Hanhardt, do you know what you are doing this morning?

THE DEFENDANT: I believe so, yes, sir.

THE COURT: Okay. Are you clear-minded?

THE DEFENDANT: Yes, sir, I am.

THE COURT: Is your plea of guilty to Count 1 and Count 2 of the superceding indictment voluntary?

THE DEFENDANT: Yes, sir, it is.

THE COURT: Are you being coerced or forced or pressured into pleading guilty here?

THE DEFENDANT: No, sir, I am not.

THE COURT: Are you pleading guilty because you are in fact guilty?

THE DEFENDANT: Yes, sir, I am.

. . . . . . . .

THE COURT: And there is no agreement between you and your attorneys or the government as to the application of the Sentencing Guidelines.

THE DEFENDANT: No. I understand.

THE COURT: This is a blind plea in every respect. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And that is the way you want it to be?

THE DEFENDANT: Yes, sir.

THE COURT: And you have said you are pleading guilty because it is – you are guilty.

THE DEFENDANT: Yes, sir.

THE COURT: Once again, do you have any questions on anything I have said?

21

THE DEFENDANT: No, sir, I have not.

THE COURT: Do you need to talk to your attorneys any further?

THE DEFENDANT: No, sir.

THE COURT: What then is your plea as to Count 1 and Count 2 of the superceding indictment?

THE DEFENDANT: Guilty, your Honor.

THE COURT: All right. On the plea of guilty there is a finding of guilty. The Court finds that the plea has been entered into knowingly, intelligently and voluntarily. Is there anything that you wish to say about your attorney or attorneys in this case?

THE DEFENDANT: No, sir.

THE COURT: Mr. Sullivan, anything further? Not necessarily anything on that point, across the board.

MR. SULLIVAN: I was holding my breath there. No, I don't think so, Judge.

THE COURT: Mr. Von Hoene?

MR. VON HOENE: Nothing further, your Honor.

THE COURT: Mr. Scully?

MR. SCULLY: Mr. Podliska.

THE COURT: Mr. Podliska?

MR. PODLISKA: Yes, your Honor. With respect to the factual basis for Count 1, so it's absolutely clear on the record, Mr. Hanhardt does agree with the factual basis as read by his attorney, Mr. Von Hoene, is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: That is certainly the inference I have drawn. And Mr. Hanhardt has just responded to that.

MR. PODLISKA: Thank you.

THE COURT: Any other issues?

MR. SUSSMAN: [There is] just one other issue, your Honor. In light of the circumstances surrounding Mr. Hanhardt's hospitalization last week, I wanted to advise the Court, and to put on the record, that both parties have obtained and reviewed Mr. Hanhardt's medical records over the past week, as well as beyond. And based on what the government's review [revealed], the government finds that there is nothing in the records to suggest that Mr. Hanhardt is not able to understand the nature and consequences of the proceedings today, and nothing to suggest that he is not able to properly assist with his defense. I'll leave it to the defense attorneys to say whether there – what their assessment of the records is.

THE COURT: The government's position is that the defendant is competent to enter the plea of guilty?

MR. SUSSMAN: Yes.

THE COURT: And you are not raising any issue of competency or fitness?

MR. SUSSMAN: Absolutely not, your Honor.

THE COURT: And, Mr. Sullivan, Mr. Von Hoene, what is the defendant's position on that point?

MR. VON HOENE: Your Honor, we concur. We are not raising an issue of competency. We have reviewed the same records that Mr. Sussman alluded to, and we concur in his characterization of the records.

THE COURT: Is that correct, Mr. Sullivan?

MR. SULLIVAN: It is. And also, your Honor, we have had the opportunity to speak with Mr. Hanhardt. Mr. Von Hoene talked to him at the MCC, and we both had the chance to talk to him this morning. And it is my opinion that he is fully alert, he knows what he is doing, and he is quite capable of making decisions on his own behalf.

THE COURT: So you are not raising any issue of competency.

MR. SULLIVAN: No, sir, I'm not.

THE COURT: You have not formed or filed any motion with respect to competency.

MR. SULLIVAN: That is correct.

THE COURT: Is that correct, Mr. Von Hoene?

Mr. VON HOENE: That's correct, your Honor. And I have visited with Mr. Hanhardt on four occasions since he was taken into custody, in addition to the review of the records. We advised the government, in conjunction with the records that were subpoenaed, that if the Court needed to review the records, of course the Court would have the opportunity to do so. If the Court is inclined to do that, although we concur in what the records characterize, we would only ask that because they are personal medical records that they be reviewed under seal. I don't think it's necessary for the court to do so in light of the representations that have been made by Mr. Sussman, with which we concur, but I wanted to afford the Court the opportunity.

THE COURT: Mr. Hanhardt, did you hear everything that the government just said about this issue of competency?

THE DEFENDANT: Yes, sir, I did.

THE COURT: And did you hear what your attorneys just said?

THE DEFENDANT: Yes, sir, I did.

THE COURT: Are you personally raising any issues with respect to your competency?

THE DEFENDANT: No, sir, I am not.

THE COURT: The Court finds that the defendant is competent. And I am not, as the Court, raising any issue of competency. So it is not raised by the government, it is not raised by the defense, and is not raised by the defendant personally, and is not raised by the Court. The Court has said and finds that this is a knowing, intelligent, voluntary plea of guilty, entered by a competent defendant who raises no issue with respect to representation by his attorneys. I accept the plea of guilty, there is a finding of guilty as to each count of the superceding indictment, and the matter is continued routinely for sentencing.

Id. at 44-61.

### c. *Hanhardt's claim of ineffective assistance of counsel is denied without an evidentiary hearing*

Hanhardt has submitted an affidavit in support of his contention that his attorneys were constitutionally ineffective. In this affidavit, Hanhardt asserts that his attorneys were aware that he was incompetent at the time of his plea hearing, and that they nevertheless coerced him to plead guilty.

> My family noted my mental and emotional unraveling. Four days before my suicide attempt, my daughter Joene, called William Von Hoene (Mr. Sullivan's partner) and informed Mr. Von Hoene that I was not thinking properly and that Von Hoene should do something about it. Mr. Sullivan and his associates did nothing, to my knowledge, and failed to inquire or investigate further. Faced with what seemed to me to be certain or virtual death regardless of what choices were made, I lost the ability to think rationally. On October 16, 2001, I attempted suicide by taking an overdose of prescribed drugs with a significant amount of alcohol. My family physician, Dr. Lakemaker, M.D., called in a psychiatrist, Leonard Carr, M.D., who issued a report stating that I required psychotherapy. I was arrested before I could receive the psychotherapeutic sessions. Instead, I was held in custody at the Bethany Hospital in Chicago, chained to the bed and guarded constantly by two members of the Chicago Police Department . . . My counsel informed me on their visits to Bethany, and later to the MCC-Chicago, that I had no choice but to enter a blind plea of guilty to the charges before this Court. They did not provide a convincing reason as to why I must enter a blind plea of guilty. I attempted to resist their pressure as best I could. At the same time, my counsel also called my wife Angeline, telling her that I must enter a blind plea of guilty. Angeline informed me that she and Mr. Von Hoene had an angry conversation in which she tried to explain that I didn't know what I was doing, that I was acting irrationally and that I needed professional help. Angeline further informed me that this phone call ultimately drove her to tears because Mr. Von Hoene refused to listen to her anguished pleas on my behalf. My mind and emotions were completely overwhelmed, as was my ability to assert my wishes. In this condition, I finally and reluctantly just "gave in" to the pressure of my counsel and pled guilty, following my counsel's lead in my responses to the court. At the plea hearing, I was asked by the Court about reserving the Title III issue to appeal; that is, I was asked about whether I was entering a conditional plea. My counsel advised [] the Court that it was not to be a conditional plea which I only understood for the first time to be the case at that very moment during the hearing. I was in no condition to argue with my own counsel and simply went along with the statements of my counsel. At the end of my plea hearing, one of the Government attorneys called to the attention of the Court my hospitalization at Bethany. My counsel had been specifically informed by at least two of my family members about

24

their belief that I did not know what I was doing, that I was acting irrationally and was unfit to make proper decisions at that time. Yet, my counsel failed to advise the Court about my condition and I simply went along with them.

William Hanhardt Aff., ¶¶ 17-25.

Hanhardt's wife and daughter also both submitted affidavits indicating that they believed

Hanhardt to be suffering from emotional and psychological problems at the time of his plea.

I noticed that my husband was not thinking properly for several weeks immediately prior to his attempted suicide on October 16, 2001. In fact, Bill's depression, anxiety and inability to think properly, clearly as an effect of all the medication he was prescribed and taking, grew worse and worse leading up to his attempted suicide. I was intimately aware that it was not my husband's intent to enter a plea of guilty. On the day preceding my husband's suicide attempt, both Mr. Thomas P. Sullivan (hereinafter "Sullivan") and Mr. William Von Hoene (hereinafter "Von Hoene") were present in our home to discuss my husband's case and impending court appearance. During the course of the conversation, Sullivan told my husband that if he did not plead guilty the next day, it would be a "bloodbath," and the Government would "come after" his family. It was after my husband's meeting with Sullivan and Von Hoene, either very late that evening or early the next morning, that my husband attempted suicide. He was rushed to Highland Park Hospital by emergency paramedics after the attempted suicide. Within a matter of days, my husband was taken from Highland Park Hospital into Federal custody. I was barred and prohibited from speaking to him or visiting with him. I was allowed no interaction with Bill. I subsequently learned of Sullivan's and Von Hoene's plan to bring my husband into [the] U.S. District Court and enter a plea of guilty. I called Von Hoene and appealed and begged him to allow me to speak to my husband prior to his court appearance. I expressed my concerns for my husband's well-being due to his depression, anxiety and inability to think rationally to Von Hoene. In substance, Von Hoene's response appeared to me to be indifferent toward my concern over my husband's well-being. After I continued to press this issue, Von Hoene became very hostile towards me, and he made it clear that he was not going to allow me to jeopardize my husband's entering a plea of guilty. I was so distraught that I was in tears after that discussion with Von Hoene.

Angeline Hanhardt Aff., ¶¶ 2-6.

On or about October 12, 2001, I had a discussion with Von Hoene. During that conversation, I expressed my concern to Von Hoene about my father's emotional and psychological state; specifically, that at that time, my father was not thinking clearly and that, in my opinion, my father needed medical attention before he could appear

in court on this case. I conveyed to Von Hoene that my father was taking a number of prescription medications at that time. I also attempted to make known to Von Hoene my father's feelings of hopelessness and helplessness, and his loss of self-worth. Von Hoene showed no reaction at all over my concerns about my father's emotional state. It appeared to me as if nothing I said about my father's mental and psychological state, and his acute medical condition, made any difference at all to Von Hoene.

Joene Hanhardt Aff., ¶ 5.

In the Seventh Circuit, district courts are instructed to hold evidentiary hearings where a § 2255 movant "alleges facts that, if proven, would entitle him to relief." Kafo v. United States, 467 F.3d 1063, 1067 (7th Cir. 2006) (quoting Bruce v. United States, 256 F.3d 592, 597 (7th Cir. 2001)). In order for a district court to grant an evidentiary hearing in a § 2255 case, the movant must do more than merely offer unsubstantiated allegations in support of his or her motion, the movant must also offer an affidavit demonstrating proof of the allegations. Id. Affidavits notwithstanding, however, an evidentiary hearing will only be justified where "the petitioner had actual proof of the allegations beyond mere unsupported allegations." Prewitt v. United States, 83 F.3d 812, 819 (7th Cir. 1996). A sworn affidavit "showing what specific facts support the petitioner's assertions" is therefore a threshold requirement, but not in and of itself sufficient, for a court to order an evidentiary hearing in a § 2255 case. Galbraith v. United States, 313 F.3d 1001, 1009 (7th Cir. 2002); Kafo, 467 F.3d at 1068 ("the allegations contained therein *become* evidence and permit the district court to evaluate properly the movant's allegations and to determine whether a sufficient threshold showing has been made to warrant further proceedings.").

In this case, Hanhardt has submitted affidavits in support of his claims. However, the assertions contained within these affidavits are directly contradicted by his sworn statements at

26

his plea hearing. Hanhardt's submission of affidavits therefore does not warrant the "commitment of judicial resources" an evidentiary hearing would require. See Kafo, 467 F.3d at 1068.

The Seventh Circuit has been clear that it is not permissible under the law for criminal defendants to gain from contradicting earlier sworn statements made at a plea hearing.

> Because many defendants seem to be under the misapprehension that a guilty plea is just provisional, and an oath to tell the truth means nothing, let us be clear. . . Entry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath. Thus when the judge credits the defendant's statements in open court, the game is over.

United States v. Stewart, 198 F.3d 984, 987 (7th Cir. 1999); see also United States v. McFarland, 839 F.2d 1239, 1242 (7th Cir. 1988) ("rational conduct requires that voluntary responses made by a defendant under oath [when entering a guilty plea] . . . be binding."). Movants in § 2255 proceedings are likewise bound by the assertions they offer under oath during plea hearings. Hugi v. United States, 164 F.3d 378, 381 (7th Cir. 1999) ("Courts take the plea process seriously and hold defendants to their representations.") (citing Brady v. United States, 397 U.S. 742, 748 (1970)).

Here, Hanhardt asserts that his attorneys were constitutionally ineffective for failing to investigate his competency to enter a plea of guilty, failing to secure medical records concerning Hanhardt's suicide attempt and hospitalization immediately preceding his plea of guilty, ignoring the pleas of various members of Hanhardt's family regarding his emotional and psychological state, and coercing him into pleading guilty when he was in a vulnerable and confused

psychological state. These assertions, however, stand in direct contrast to statements he made in open court, under oath, at his October 25, 2001 plea hearing.

During that hearing, Hanhardt repeatedly indicated that he was clear-minded and well aware of what he was doing.

> THE COURT: I'm asking you these questions in order to determine whether you are clear-minded this morning, and to be sure that you know what you are doing, and that is the reason why I'm asking these specific questions. But are you clear-minded this morning?
> THE DEFENDANT: I believe I am.
> . . . . . . . .
> THE COURT: All right. Do you know what you are doing?
> THE DEFENDANT: Yes, I do.
> THE COURT: And you have talked to your attorneys, Mr. Von Hoene and Mr. Sullivan, this morning?
> THE DEFENDANT: Yes, I have.
> THE COURT: Were you able to understand what they were saying to you?
> THE DEFENDANT: Yes, I d[id].

Plea H'g, at 4-5.

> THE COURT: So this is – I don't want to put words in your mouth – but as I understand what you are suggesting here, it is a complete, full and absolute plea of guilty. Unconditional.
> MR. SULLIVAN: That is correct.
> THE COURT: And, Mr. Hanhardt, have you discussed this just now with Mr. Von Hoene and Mr. Sullivan?
> THE DEFENDANT: I understand it completely and I agree.
> THE COURT: So that it is absolutely clear, the Court is not accepting your plea here as a conditional plea. Do you understand that?
> THE DEFENDANT: I understand. I understand.
> THE COURT: Now, you have told the Court that you have discussed this case on numerous occasions with all of your attorneys, is that right?
> THE DEFENDANT: Yes, sir, I have.
> THE COURT: Once again, have you has enough time to think about all these matters?
> THE DEFENDANT: Yes, sir, I have.

Id. at 47-48.

28

THE COURT: All right. Now, Mr. Hanhardt, do you know what you are doing this morning?
THE DEFENDANT: I believe so, yes, sir.
THE COURT: Okay. Are you clear-minded?
THE DEFENDANT: Yes, sir, I am.

Id. at 49.

Hanhardt also indicated, under oath, that he was not being forced or coerced into pleading

guilty. In fact, Hanhardt positively affirmed that he was entering this plea of his own free will.

THE COURT: Is your plea of guilty to Count 1 and Count 2 of the superceding indictment voluntary?
THE DEFENDANT: Yes, sir, it is.
THE COURT: Are you being coerced or forced or pressured into pleading guilty here?
THE DEFENDANT: No, sir, I am not.
THE COURT: Are you pleading guilty because you are in fact guilty?
THE DEFENDANT: Yes, sir, I am.

Id. at 49-50.

As to the issue of Hanhardt's competency, the court inquired of the government,

Hanhardt's attorneys, and Hanhardt himself as to whether there was any issue as to competency.

No party, including Hanhardt, indicated that Hanhardt's competency was an issue in this case.

MR. SUSSMAN: [There is] just one other issue, your Honor. In light of the circumstances surrounding Mr. Hanhardt's hospitalization last week, I wanted to advise the Court, and to put on the record, that both parties have obtained and reviewed Mr. Hanhardt's medical records over the past week, as well as beyond. And based on what the government's review [revealed], the government finds that there is nothing in the records to suggest that Mr. Hanhardt is not able to understand the nature and consequences of the proceedings today, and nothing to suggest that he is not able to properly assist with his defense. I'll leave it to the defense attorneys to say whether there -- what their assessment of the records is.
THE COURT: The government's position is that the defendant is competent to enter the plea of guilty?
MR. SUSSMAN: Yes.
THE COURT: And you are not raising any issue of competency or fitness?

MR. SUSSMAN: Absolutely not, your Honor.

THE COURT: And, Mr. Sullivan, Mr. Von Hoene, what is the defendant's position on that point?

MR. VON HOENE: Your Honor, we concur. We are not raising an issue of competency. We have reviewed the same records that Mr. Sussman alluded to, and we concur in his characterization of the records.

THE COURT: Is that correct, Mr. Sullivan?

MR. SULLIVAN: It is. And also, your Honor, we have had the opportunity to speak with Mr. Hanhardt. Mr. Von Hoene talked to him at the MCC, and we both has the chance to talk to him this morning. And it is my opinion that he is fully alert, he knows what he is doing, and he is quite capable of making decisions on his own behalf.

THE COURT: So you are not raising any issue of competency.

MR. SULLIVAN: No, sir, I'm not.

THE COURT: You have not formed or filed any motion with respect to competency.

MR. SULLIVAN: That is correct.

THE COURT: Is that correct, Mr. Von Hoene?

Mr. VON HOENE: That's correct, your Honor. And I have visited with Mr. Hanhardt on four occasions since he was taken into custody, in addition to the review of the records. We advised the government, in conjunction with the records that were subpoenaed, that if the Court needed to review the records, of course the Court would have the opportunity to do so. If the Court is inclined to do that, although we concur in what the records characterize, we would only ask that because they are personal medical records that they be reviewed under seal. I don't think it's necessary for the court to do so in light of the representations that have been made by Mr. Sussman, with which we concur, but I wanted to afford the Court the opportunity.

THE COURT: Mr. Hanhardt, did you hear everything that the government just said about this issue of competency?

THE DEFENDANT: Yes, sir, I did.

THE COURT: And did you hear what your attorneys just said?

THE DEFENDANT: Yes, sir, I did.

THE COURT: Are you personally raising any issues with respect to your competency?

THE DEFENDANT: No, sir, I am not.

Id. at 58-61.

The contentions that underlie Hanhardt's current ineffective assistance of counsel claim,

his competency and the issue of whether he was coerced into pleading guilty, are therefore

contradicted by his sworn statements offered at his earlier plea hearing. As the Court has noted,

Hanhardt may not, under the law, gain a benefit in his § 2255 Motion in this manner. See Stewart, 198 F.3d at 987; Hugi, 164 F.3d at 381. Hanhardt had a chance at his plea hearing, under oath, to indicate whether issues of coercion or competency existed, and he asserted in no uncertain terms that there were no such issues. The law simply does not allow Hanhardt, at this late date, to benefit by contradicting his earlier sworn statements. The Court therefore finds that there are no factual grounds upon which Hanhardt can base a claim of ineffective assistance of counsel. Hanhardt's second and final claim under § 2255 therefore fails.

### III. CONCLUSION

For the foregoing reasons, Hanhardt's Motion to Vacate, Set Aside, or Correct Sentence filed pursuant to 28 U.S.C. § 2255 is denied. The Court determines that an evidentiary hearing is not required in this case. See 28 U.S.C. § 2255 (providing, in part, that an evidentiary hearing is not necessary if the "motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief."); see also Bruce, 256 F.3d at 597.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: February 9, 2009